The next case for argument is 21-1123 In Re Robbins Depending on the level of access a particular person is entitled to, they may see a version where there's no blurring going on, or they may see a version where there's partial blurring, or they may see yet another version where there's a lot more blurring. Which one is it? Well, you actually described quite a few there, but it's sort of on the latter half of that. The idea here is that the prior art was simply recording and storing. And the problem with this environment is... Okay, so you're starting to migrate away from my question. Let's go back to the question. No, no, I'm returning to your question. I wanted to state that. Let me ask it again. Go ahead, sure. Okay, so there's a question of being able to access this content, this video content. And then based on the authorization, they're going to get some version of the video content. That is exactly correct, Your Honor. Okay. And that's why... They're either going to see a version that has no blurring, or they're going to see a version with some blurring. Is that how this claimed invention works? You know, there's actually a version where they may not... Oh, please, can you say yes or no? Yes, Your Honor, yes. But there's another version where they don't see anything at all. Right, denied complete access. Yes, denied access, yes. Correct. Okay. So we've had a lot of cases where these sorts of authorization to access certain things, we've called that an abstract idea. In some cases, yes. In other cases, no. And then we also have other cases where we've said the notion of content is also an abstract idea without anything more. If you're looking at content extraction, for example, that's the case about the checks where a certain content got redacted, and we said that's an abstract idea, just the idea of redacting some content from some document. That's correct. And so I think the thing is here we talk about context a little bit, the health care information industry and so on. What we're talking about, though, here is a combination in an unusual way of comparing, of taking that access system, right, which is so critical with health information, and applying it to this blurring in a very specific way because you're comparing information that's already in and stored in the system, right, and that's the determining step in the claim, right, is you're determining, you're identifying, and the specification describes how to do that, you're identifying the person in the video by their physical characteristics, right, and then you are determining, based on those physical characteristics, who's in the video, and then you're comparing it to the access level, and again, as you say, depending on how many people are there and what they're doing, and what they're doing is often, you know, that's also covered by the claim. We have this idea of a program as being part of the caseload, what a caseload is. This is something that their access can be tailored to the particular members of the audience, and that is exactly what was going on in Texas. Okay, so I see here that the board says the ineligible concept here is redacting confidential information based on privilege rules. Right. Yes, that's what they said. What's wrong with that? That's an oversimplification of the claim, right, because this is very specifically limited to video, right, and, you know, comparing images, right, and, you know, this is image data here that is being, you know, if you're simply just redacting something based on, you know, whatever, you know, information that you may have, but this is a very specific where you're going in, looking at the video, identifying who is in there, and then comparing it to a set of rules, this caseload rules-based access. So we have, you know, in my view, this is sort of a combination- How is that different from what the board said? Because, I mean, that sounded a lot like relying on a set of privilege rules and then redacting some portion of the image based on those privilege rules. Redacting the display of certain information based on those- Because it leaves out the identity of the individual in there, right? You know, the problem is that privilege rules have to be tied to the identity of the people in the app. That's a very specific thing that's in this claim, is that we're talking about some individuals that you do have access to, other individuals that you don't, and that you're identifying those individuals as part of the claim. So the permissions and the redactions or non-redactions based on them are more specific. Yes, it's a specific- This is one of the things that's in your law. But it's not just redacting information, it's just a more specific application. It is a very specific application, and that's the kind of specific improvement in video processing technology. How does it improve processing? It's just using the computer to give you more complex authorizations, but it's still just an authorization process. It's just further refined. Well, the board said this is a purported improvement in video processing technology. That's what they said. And I'm taking them at their word. I mean, if you want to disagree, that's the one thing the board didn't get quite right. It is a purported improvement, but it's not. It's an improvement only in terms of the rules can be more complex and deal with video as opposed to just text-based information. But it doesn't change the way the computer works, the processor works, the camera works, or any of that does. It doesn't have to. It's exactly like Diamond v. Deere where the added step was temperature measurement. And if you look at the claim in footnote 5 of Diamond v. Deere, there's the claim, and it says, measuring temperature. And that's all it says. So blurring, this step of blurring, we don't have to disclose precisely how blurring is done. We don't have to improve the way that blurring is done. We have to attach that blurring to that new blurring step to something else to make a new and unconventional process, which is what we've done. I guess you have to parse your last sentence in a lot of different ways. We add something. There were contradictory phrases in your sentence. Are you doing something new and different, or are you characterizing it as being new and different because you're doing something old and conventional in a new system in healthcare, where it's never been done in healthcare? It's been done in other industries numerous times in different ways, but we're applying it here in a specific way to the healthcare industry. So are you claiming that the specific thing you're doing is inventive? Are you claiming that doing it for the first time in the healthcare industry is what's inventive about this? I'm just not clear. I think both of those things are true, Your Honor. I think that because there is nothing in the record here, because the examiner and the board at every stage, and right up into the director's brief, failed to provide any evidence of how other boarding systems worked. They merely said it was conventional. They merely said that this step, as added in here, didn't add anything. They didn't look in the healthcare industry for any evidence of this. Meanwhile, we supplied evidence, a declaration. The specification itself talks about how this is an issue, an unsolved problem. The specification talks about video blurring, and it talks about it as if it's a known technique, right? No. It says information in audio or video files can also be shown after removing or blurring individuals beyond recognition to staff who do not have caseload access on them. Yes, that's describing exactly how this system works. That's not saying that it's something that already exists. It's actually saying that this is something new. This is part of the invention. That you invented what? What is it? Blurring? I thought we already established it. This idea of differential blurring based on access rules is something that just simply did not exist. And it is a very specific solution to a very specific problem that really only arises in this kind of 24-hour video surveillance system where you have multiple people who have access to a very large volume of data. And this is why it's very similar to the TechSec case where the idea was that you were adding in that case there was encryption, there was labeling. TechSec didn't claim to have invented encryption or labeling. What they were claiming to invent was adding those things to a security system by which only certain people would have access. But in using rules to limit who could access information and obscuring information the user isn't authorized to see, is that really a problem specifically arising in the realm of computer networks or computers? Yes it is. In video surveillance systems it totally is. Because the issue is, as I said, that there's no evidence in the record of anything in the prior art other than taking video and storing video. And then the issue was who gets access to the video. But we also accept that blurring video was also a known thing to do. That's where we began this oral argument. That's correct. And the idea is that I have to admit that the concept of blurring was out there before this application was filed. That's true. How do those blurring systems work? What was done with those? Were they done manually? Was there anything like this? And there's nothing in this claim that distinguishes the step of blurring here, the act of blurring, whatever the technical requirements are to blur a portion of a video from what was already known and established in the art of blurring. You're not claiming, and this is a specific way that we want to do the blurring here for the purposes of this claim. Right. We've said many times in the briefs that we're not claiming a new way of blurring. Right. Or a specific code to blur. Or a specific way. No specific, well, actually, because blurring is a subset of redaction, I mean, actually, the claims here were amended. At one point, the claims did say redaction, and then that was changed. It was changed to blurring because the specification actually disclosed several ways of redacting. So blurring is actually a specific solution to this particular problem. I mean, you can imagine, and in fact it's disclosed in the specification, that rather than blurring, you could entirely remove a section of the image. You could put a smiley face over someone's face. You could put smiley faces. There's a lot of ways to do it. But what if I wrote a claim to generating a document, and I said in the claim, generating a document using Microsoft Word. The fact that I recite in the claim using Microsoft Word, it narrows the claim, but I don't think that all of a sudden transforms an otherwise ineligible claim into a patent-eligible claim merely by the fact that I've limited the scope of the claim to the use of Microsoft Word, have I? I would say again that if we look at Deere, if we look at Deere and how Deere was decided... Are you suggesting that the recitation of use of Microsoft Word could be... I'm saying that the context, if the industry that we're talking about, which you didn't... This has to be looked at through the lens of the industry. That's the thing. And that was certainly not done here by the board. There's almost no references in the board's decision or in the director's brief to the electronic... I'm sorry, to the health information technology issue. Health information technology is actually something defined by Congress as being an area of technology in the HITECH Act. I mean, it's very unusual when we have a case where we're arguing whether something is an area of technology that may be improved where here we actually have a congressional definition that this is an area of technology that can be improved. We're way beyond our time, so let me hear from the other side of the room. May it please the court, Daniel Kasdan on behalf of the USPTO. I'm sorry, just please restore your mask. Thank you. The invention here, and this is to take a technology that exists and apply it to the HITECH space. But this is, I think ultimately, and this is I think what Judge Hughes said in the beginning, cases like intellectual ventures and OIT have all said, you don't make an idea not abstract by just limiting it to one field. I kind of think that disposes of the case. Basically, we have a technology of blurring, which they're not describing and they're not explaining how the technology of blurring is working. They're just applying blurring based on a set of rules. They're sort of applying a set of rules that is a standard abstract idea as this case court found in Abel and other cases like that. And so then, I mean, I guess that's really all I have to say. I'm happy to take questions. If not, you can ask. No, no, no. Sorry. What about his references to Deere and also his arguments that this is based on this caseload thing and this is just different enough that would stand scrutiny under cases like Deere and Deere's analysis and the other case he referred to which was, I guess, Texec. I think in Texec, what you have is the use of the label and the technology is actually affecting the technology that you're using. That's what's missing here. There's the abstract idea of blur. You don't get to see people you shouldn't see and you do get to see people you should see. Pacer has that, if I'm not logged in, I can't see the sealed version. I could see the unsealed version. And then, the technology. But there's not, the fact that you want to use it in high tech is still just a set of rules that you're going to be using. And I think that's fundamentally why this case is different than Texec and the other cases of that is that there's no connection to the technology. It's just the technology on one side and the abstract and the set of rules and just saying, put them together, apply it. But your friend keeps referring to these caseloads that are in the claim and that that makes this different and non-abstract. I mean, but the caseloads are if you have permission to see it, you see it. And if you don't have permission to see it, you don't see it. That's just an idea of how you do it. It's like a rule of a game. Or it's like an intermediated settlement in the Supreme Court cases. These are all just... It's not a specific way of telling you how to give authorizations. It's the idea of some people get authorizations based upon certain access, some people get more, some people get less, some people get zero. I wish I had said it as clearly as that. Yes, that's exactly right. And so that's, I think, fundamentally why there's not a technological invention here. It's just applied technology in the space. And then he keeps talking about how we haven't introduced evidence, but I feel like that happened in Alice. The Supreme Court has no problem saying, we know that computers exist, we know that and if it was in dispute whether blurring existed, then it would sort of be important to the examiner to show. But they've never argued that blurring, they've candidly admitted that blurring was out there before, and if it wasn't then the spec doesn't teach you how to do it. So that's, I mean, I guess that's where I feel like it's just a specific application of a technology, but that's... But the real invention here is the abstract idea of applying it in the high-tech space. I mean, in the healthcare space. But there could be a circumstance where they're applying it in a detailed, very specific and novel way, and wouldn't that take that out of the realm of the abstract? I mean, I think it would be sort of, to use Judge Chen's example, if I say, do this by turning on your computer, using Microsoft Word, typing these seven letters, or whatever. Right? Like, the fact that you're giving very specific instructions about how to do it, just like the, sort of the railway tickets of like a hundred years ago in eligibility cases. The very... It's not the details that really are where you're going to get eligibility. The question is, under Step 1 of Alice, what ultimately is the claim directed to? And here the claim is directed to deciding who gets to see information, and that could have been done by people in their head. That's just an idea out there. And then just using the blurring technology, the off-the-shelf blurring technology to implement that. And so that's how I see the difference between this and TXAC and DEAR, and makes it more akin to the cases like Erickson, or last week's case of the USR, the universal storage, and these other cases about who gets access to information, and there are many. In the Mittal article, he catalogs a lot of them in one place. That's where I see the case landing. Now you can sit down. And I'm sorry for jumping the gun before you. Okay. Will we still have two minutes of rebuttal if we need it, Mr. Kleiber? Thank you. I will be as brief as possible. I think one of the things my colleague said is that he doesn't think that this affects the technology that it's used in. I think my client would certainly disagree with that. I mean, this is a very specific use of very specific technology to make a specific improvement in an area that was absolutely necessary. An improvement in the technology. Yes, in health information technology. One thing that I would direct the Court's attention to is Appendix 1281, which is an actual screenshot from the prior patent that shows a caseload field and all of the information that goes into it. The description of caseloads and, without oversimplifying caseloads, there's a great deal of flexibility in how a caseload is set up and it's described in some detail in the prior patent that's incorporated by reference. So to say it's merely just who gets to see what and who gets to, you know, things like that, I mean, at a very high and oversimplified level, that's true. But, you know, the caseload here, which is we called out this as a term, caseloads, and didn't just use the word access rules. We could have put something like that or just privilege rules or something like that in the claim. We're not claiming just privilege rules. We're claiming a very specific caseload application here. And caseloads is something, again, that we incorporated from this prior patent into this application. So what am I supposed to think about when you say the word caseloads? A caseload in this particular area, in health information technology, a caseload, it can be based on the identity of the individual or the aspect of whether that individual is enrolled in a particular program within the healthcare facility. That's one of the things here is that this is directed to people with severe cognitive disabilities. There's an example in the specification of this application talking about how there's an individual who's learning to brush his teeth, and meanwhile there's a fight going on in the background. This is a very specific problem that is in this area that is being handled by this application. And it is, there simply was nothing like this manual or automated in this industry before that. The application of the caseloads type of access rules, the specific kind of access rules with blurring technology is what's being claimed here. And that's why I think the board should be reversed. It's particularly in view that there's no substantial evidence of any blurring technology, anything like this, in this industry. Thank you. We thank both sides.